# IN THE COURT OF APPEALS OF IOWA

No. 14-0630
Filed December 24, 2014

**BECKY A. CLAUSEN,**
    Plaintiff-Appellant,

**vs.**

**JILL M. CLAUSEN,**
    Defendant-Appellee.

_____

Appeal from the Iowa District Court for Woodbury County, Mary Jane Sokolovske, Judge.

A grandmother appeals the district court's denial of her petition for grandparent visitation. **AFFIRMED.**

Alice S. Horneber of Horneber Law Firm, P.C., Sioux City, for appellant.

Elizabeth A. Row of Elizabeth A. Row, P.C., Sioux City, for appellee.

Considered by Danilson, C.J., and Doyle and Tabor, JJ.

**DANILSON, C.J.**

The paternal grandmother, Becky Clausen, appeals from the district court's denial of her petition for grandparent visitation. Becky contends the mother, Jill Clausen, is unfit to make decisions regarding visitation. She also contends it is in the best interests of the children to grant the grandparent visitation. The mother requests we affirm the district court's denial of the petition and seeks an award of appellate attorney fees. Because Becky has not overcome the presumption Jill is fit to make decisions regarding visitation, we affirm the district court's denial of the petition. We deny Jill's request for attorney fees, as no statute or agreement exists to support such an award.

**I. Background Facts and Proceedings.**

The facts are largely undisputed, and we adopt the district court's recitation of facts as our own:

> Dustin and Jill were husband and wife. Their relationship began in September 2001 when they began dating and eventually they moved in together. Three years into their relationship Jill became pregnant with the oldest child C.D.C. who was born in 2004. Dustin and Jill were married and remained living together as husband and wife until Dustin's tragic and untimely demise on August 10, 2013. Dustin passed away suddenly at the age of thirty-five.
> During their marriage, Dustin and Jill had two more children, T.M.C. born in 2010 and M.L.C. born in 2011.
> After the birth of their first child C.D.C., Dustin and Jill had Pat Wolf provide day care for C.D.C. while both parents worked. Pat Wolf provided this day care until C.D.C. entered school. Upon the birth of their second child T.M.C., Jill worked at home and took care of C.D.C. and T.M.C. There was a period of time when Becky provided day care for C.D.C. while his parents worked.
> The mother went to work at Pech Optical and Becky provided day care for C.D.C. and T.M.C. After the birth of M.L.C. Becky provided day care for all three children while Jill and Dustin worked. Dustin did pay Becky $100.00 a week for her services in caring for the children.

As a result of the ongoing contact between Becky and her grandchildren, Becky developed a strong bond with the children. She would assist in picking up the oldest from school and would take the children to doctor appointments. Becky testified that it is her belief that she has equal rights to the children as much as Dustin and Jill had as parents. In defendant's exhibit 103, Becky testified to the following in a deposition, "I don't know the law, but those babies were just as much my babies as they were her and Dustin's. And my son told me that. And those kids have been with me since they were born."

Jill testified that Dustin was a good father and the two had a good relationship. She stated that she and Dustin would have disagreements often about his mother's involvement in their family life. Jill was not happy when Dustin took his mother's side over hers. There was a several month time frame wherein Dustin, Jill, and C.D.C. resided in Becky's home. A disagreement arose between Becky and Jill and name calling ensued. Becky told Jill to leave her home.

Jill stated that Becky was a controlling person. Becky's own sister testified that Becky at family gatherings was taking care of children or directing people and in control of the situation. Becky believes Jill lies to her and cited instances regarding Jill's "job loss" and a "tattoo" for examples of those lies. Becky stated that Jill told her falsehoods about these two issues. . . .

Becky felt it was her place to secure counseling for her grandchildren after Dustin's death. Without consulting Jill she spoke with the children's doctor about setting up counseling for the children. Jill had already addressed the counseling issue with C.D.C.'s school and was directed to Siouxland Mental Health which was followed through with. Becky testified that she believes that all three of the children and Jill need counseling to deal with Dustin's death.

. . . Becky testified that Jill is selfish and she loves the children only to the extent she is able. Becky further testified that she is the proxy for her deceased son and that it is in the best interest of the children for her to have continued care of the children. Becky testified that she would keep Dustin alive for the children and the children would help her in the loss of Dustin. Becky admitted calling her deceased son's phone and leaving a voicemail to him. The voicemail was critical of Jill and called her unreasonable and he needed to wake her (Jill) up.

Jill was unaware of the depth of this criticism until this case was brought. Dustin passed away on August 10, 2013. Jill continued to allow Becky unfettered access to the children. Becky continued to provide day care while Jill worked.

Shortly after the funeral, Becky expressed to Jill that Jill's actions made her feel that Jill didn't love Dustin. She accused Jill

of having an affair with Jesse Smith after the death of her son. Becky testified that she learned of this from her grandson . . . .

Approximately one month after Dustin's passing, Becky went to her attorney about the children. She testified that she was concerned that Jill suffered from asthma and Bells Palsy and that these health concerns were sufficient enough that provision should be made to assure the children would be placed in Becky's care. A Petition for Appointment of Guardian (Standby) was prepared. In the petition at paragraph 4 it states, "I have health concerns which may make it impossible for me to provide for the care of the proposed wards." The petition named Becky Clausen as the proposed guardian of the children.

Becky took the petition to Jill and urged her to sign the same. Becky further told Jill that if she didn't understand the petition that her attorney would be willing to review the petition with her. Jill testified that neither medical condition would render her unable to care for her children. Jill declined to sign the petition. Jill testified that Becky became angry that Jill did not sign the guardianship petition. Jill however, continued to allow the children and Becky to have contact even though Becky presented the guardianship petition to her.

On October 8, 2013, Becky filed her petition seeking grandparent visitation. The petition was served on Jill on October 9, 2013. Shortly after the petition was served, Jill reconsidered allowing Becky unfettered contact with the children. Jill did not send the children to Becky for child care on October 10 and 11, 2013. Becky called Jill on October 12, 2013 at approximately 8:30 a.m. Jill didn't answer the phone calls. Approximately thirty minutes later, Becky called the police to go to Jill's residence and check on the children. The police did go to Jill's residence and found nothing wrong.

Jill has made a police report regarding the conduct of Samantha Clausen. Samantha resides with Becky and is the paternal aunt of the children. Samantha came to Jill's employment on October 10, 2013. Samantha testified that she was curious if Jill was at work. Samantha also went to C.D.C.'s school and waited until Jill picked up C.D.C. She proceeded to follow Jill in an effort to see if Jill was taking the children to Jill's house or to Jesse Smith.

The district court filed a ruling on April 4, 2014. In it, the court found that Becky had "established a substantial relationship with the child[ren] prior to the filing of the petition." Iowa Code § 600C.1(3)(b) (2013), *see also* § 600C.1(5)(c) ("[S]ubstantial relationship includes but is not limited to any of the following: [t]he

grandparent . . . has had frequent visitation including occasional overnight visitation with the child[ren] for a period of not less than one year."). However, the district court denied Becky's petition, finding she had not established by clear and convincing evidence that it was in the best interest of the children to grant the visitation nor that Jill was unfit to the make the decision regarding visitation. *See* § 600C.1(3)(a), (c).

Becky appeals.

## II. Standard of Review.

We review the district court's denial of grandparent visitation de novo. *Graves v. Eckman*, 550 N.W.2d 470, 471 (Iowa Ct. App. 1996). "We give weight to the fact findings of the juvenile court, especially regarding the credibility of witnesses, but we are not bound by them." *In re of K.R.*, 537 N.W.2d 774, 776 (Iowa 1995).

## III. Discussion.

### A. Petition for Visitation.

Pursuant to Iowa Code chapter 600C, grandparent visitation, the court may grant visitation to a petitioning grandparent if it finds, by clear and convincing evidence: (1) it is in the best interests of the children to grant such visitation; (2) the grandparent has established a substantial relationship with the children prior to the filing of the petition; and (3) the grandparent has overcome the presumption that the parent who is being asked to temporarily relinquish care, custody, and control of the child to provide visitation is fit to the make the decision regarding visitation. Iowa Code § 600C.1(3)(a)–(c).

A grandparent does not have an equal claim to children to that of a parent and is not entitled to subsume the role of the grandparent's deceased child. As reflected in the statute, in order to be awarded visitation, the petitioning grandparent must overcome the presumption that the parent denying visitation is fit to make the decision. Iowa Code § 600C.1(3)(c). The grandparent can do so by establishing by clear and convincing evidence the parent is unfit to make such decisions or the parent's judgment has been impaired. Iowa Code § 600C.1(3)(c)(1), (2). Impaired judgment of a parent may be evidenced by neglect of the children, abuse of the children, violence toward the children, indifference of absence of feeling toward the children, demonstrated unwillingness and inability to promote the emotional and physical well-being of the children, drug abuse, and/or a diagnosis of mental illness. Iowa Code § 600C.1(3)(c)(2)(a)–(g).

Upon our de novo review of the record, we agree with the district court that Becky failed to overcome the presumption that Jill is fit to make decisions regarding visitation. As noted by the district court, "There was no evidence of neglect, abuse, violence, indifference, absence of feeling or a demonstrated unwillingness and inability to promote the emotional and physical well being of the children. [The mother] does not abuse drugs or have a diagnosis of a mental illness." Although the mother may not be the best housekeeper and may be involved in a new relationship, the grandmother's criticisms of the mother do not rise to the level of being unfit. Because the resolution of this issue is dispositive, we do not need to consider whether a substantial relationship between Becky

and the grandchildren exists nor whether it is in the best interests of the children to award Becky visitation.

**B. Attorney Fees.**

Because Iowa Code chapter 600C does not provide for an award of attorney fees, we deny the mother's request for an award of appellate attorney fees.[1] *See Van Sloun v. Agans Bros., Inc.*, 778 N.W.2d 174, 182 (Iowa 2010) ("In order for fees to be taxed the case must come clearly within the terms of the statute or agreement.").

**IV. Conclusion.**

Because Becky has not overcome the presumption Jill is fit to make decisions regarding visitation, we affirm the district court's denial of the petition. We decline to award appellate attorney fees.

**AFFIRMED.**

---

[1] An award of attorney fees was previously available pursuant to Iowa Code section 600C.1(9) (2009). However, the statute has since been amended and no longer provides for such an award. *See* Iowa Code § 600C.1 (2013).